UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
OXFORD TECHNOLOGIES, INC. d/b/a OXFORD
INDUSTRIES,

                            Plaintiff,

    -against-

EAST/WEST INDUSTRIES, INC.,

                            Defendant.
-------------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
CV 18-1992 (ADS) (ARL)

**LINDSAY, Magistrate Judge:**

       The plaintiff, Oxford Technologies, Inc. d/b/a Oxford Industries ("Oxford"), commenced this action against East/West Industries, Inc. ("East/West") seeking a declaratory judgment and damages for East/West's alleged breach and anticipatory breach of its contract with Oxford and for reformation of the contract based on mutual mistake and fraud. Oxford also asserted claims for fraudulent inducement, deceptive business acts and practices, constructive fraud, negligent misrepresentation, equitable estoppel, unjust enrichment, breach of implied covenant of good faith and fair dealing and violations of § 191-c of the New York Labor Law. All the claims arise out of East/West's alleged refusal to pay Oxford commissions on the sale of East/West's helicopter seats to a third-party who contracted to manufacture and sell helicopters to the United States Department of Defense. Currently before the Court, on referral from District Judge Spatt, is East/West's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 9(b) and 12(b)(6). For the reasons set forth below, the undersigned respectfully recommends that the defendant's motion to dismiss be granted.

## BACKGROUND

The following facts are drawn from the complaint and are accepted as true for purposes of the instant motion. *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). These facts, however, do not constitute findings of fact by the Court. *See Colvin v. State University College at Farmingdale*, No. 13-CV-3595 (SJF)(ARL), 2014 WL 2863224, at *1 n.1 (E.D.N.Y. June 19, 2014).

### I.    The Parties' 2004 Agreement

Oxford is a Connecticut corporation in the business of providing sales and marketing services for clients primarily in the aerospace industry. Compl. ¶¶ 8, 15. East/West is a New York corporation that, among other things, sells and manufactures helicopter seats. *Id.* ¶ 17. In or around 2004, the United States Department of Defense ("DOD") agreed to purchase various helicopters from nonparty Sikorsky Aircraft Corporation ("SAC"). *Id.* ¶ 14. At the time, Oxford, who was acting as a sales representative for SAC, was contacted by East/West in connection with the sale of helicopter seats to SAC for use in its helicopters. *Id.* ¶¶ 16-17.

On May 10, 2004, Oxford entered into an agreement with East/West (the "2004 Agreement"), wherein Oxford agreed to provide sales and marketing services to East/West, including acting as East/West's exclusive sales representative for SAC, at the rate of $3,033.00 per month plus a commission of five percent (5%) on all payments received by East/West for the products or services sold to SAC. *Id.* ¶ 18. Pursuant to the 2004 Agreement, East/West was required to pay Oxford commissions related to the SAC sales on the last business day of each month following any month East/West received payments from SAC. *Id.* ¶ 22. The 2004 Agreement also required East/West to pay Oxford all commissions due on purchase orders and/or accepted contracts with SAC upon termination of the 2004 Agreement. *Id.* ¶ 23.

2

### 2. The Helicopter Seats and Oxford's Agreement to Lower Commissions

According to the complaint, SAC required three different types of seats for the helicopters it was manufacturing for the DOD: the "CH-53K Troop Seat;" the "CRH Stowable Recovery Team Seat;" and the "CRH Primary Aircrew Cabin Seat." *Id.* ¶¶ 24, 27, 30. Oxford estimates that the value of East/West's potential sales of CH-53K Troop Seats to SAC for the years 2008 to 2031 is approximately $30,000,000.00. *Id.* ¶ 25. Oxford estimates that the value of East/West's potential sales of CRH Stowable Recovery Team Seats to SAC for the years 2015 to 2029 is approximately $10,000,000.00. *Id.* ¶ 28. Oxford estimates that the value of East/West's potential sales of CRH Primary Aircrew Cabin Seats to SAC for the years 2018 to 2028 is approximately $20,000,000.00. *Id.* ¶ 28.

Despite the terms of the 2004 Agreement, and before East/West was awarded any contract with SAC, Oxford agreed to lower its commission in connection with the potential sale of CH-53K Troop Seats to $50.00 per seat. *Id.* ¶ 28. Oxford contends that it did so to enable East/West to offer SAC a "no cost, nonrecurring program regarding development, qualifications and data requirements," an offer which Oxford says ultimately helped to convince SAC to buy helicopter seats from East/West. *Id.* ¶ 33. Oxford emphasizes that it did not agree to lower its commission with respect to the sale of the CRH Stowable Recovery Team Seat, the CRH Primary Aircrew Cabin Seat or any other helicopter seat that East/West might manufacture and sell to SAC. *Id.* ¶ 34.

### 3. The 2008 Agreement

On or around April 25, 2008, Oxford and East/West were notified that East/West was awarded a contract for Ch-53K Troop Seats. *Id.* ¶¶ 35-6. Following the announcement, Oxford and East/West negotiated the terms of a new written agreement in order to reflect Oxford's

3

willingness to receive a lower commission in connection with the sale of CH-53K Troop Seats. *Id.* ¶ 37.[1] According to Oxford, the parties discussed the terms of the new agreement for over a month because they disagreed as to the timing of the commission payments, specifically, whether the payments were to be made monthly based upon revenues to be received by East/West or upon East/West's shipment of the CH-53K Troop Seats to SAC. *Id.* ¶ 38. Despite the parties' dispute as to timing, Oxford contends that it was clear that Oxford was to continue to receive a 5% commission for all other products or services provided by East/West to SAC, including the potential sale of the CRH Stowable Recovery Team Seat and the CRH Primary Aircrew Cabin Seat. *Id.* ¶ 37.

Toward the end of their discussions, East/West sent Oxford a proposed agreement reflecting the new commission rate to be paid for the CH-53K Troop Seats. *Id.* ¶ 39.[2] However, the parties continued to debate the terms and five days later, East/West sent Oxford a 30-day notice indicating its intent to terminate the 2004 Agreement effective June 19, 2008. Malafi Decl. Ex. C. That letter stated:

> It is with great regret that I must write this letter at a time when Oxford and East/West should be finally celebrating a success with Sikorsky and not parting ways because of our inability to agree to terms for the CH-53K Troop Seat Program.
>
> East/West had informed Oxford in a meeting that for the CH-53K program we had decided to make an extraordinary effort to capture the work. We were offering Sikorsky a no cost developmental effort with "cut to the bone" production pricing. *You agreed with our strategy and to negotiate an amended commission for this program only.*
>
> During our negotiations it has become evident that we will not able to reach terms. East/West [cannot] accept an agreement that requires us to provide

---

[1] As discussed below, the 2008 Agreement supersedes the 2004 Agreement.
[2] According to the complaint, copies of the May 15, 2008 correspondence attaching the proposed revised agreement was annexed to the complaint. *Id.* at ¶ 39. The copy of the Complaint filed with the Court does not include any of the attachments. Counsel for the East/West has, however, annexed copies of the exhibits referenced in the complaint to her declaration. Malafi Decl. Ex. C.

4

> <u>significant commissions to Oxford years before they are due</u>. Initial production deliveries to Sikorsky and payments to East/West will not commence until the year 2014 and will not reach peak levels until 2017. We [cannot] make significant commission payments in 2008 through 2012 when we are not receiving payments from Sikorsky, Oxford and East/West have reached an [i]mpasse.
>
> Therefore [i]n accordance with the final paragraph of the Subject Agreement this latter represents East/West's 30 day notification that we are terminating the Agreement effective June 19, 2008.

*Id.* (emphasis added in italics).

Although it is not clear how the parties resolved the stated "impasse," in November, the parties did execute a new agreement in which East/West agreed to retain Oxford at a rate of $2,000.00 per month offset against commissions earned, to pay a $50.00 per seat commission for "*all helicopter seats sold excluding seats provided at no cost*," and "to pay a standard commission at 5% for all other sales of any product or service provided by East/West to [SAC]" (the "2008 Agreement"). *Id.* (emphasis added). The 2008 Agreement was forwarded to Oxford by email, on November 12, 2008, and was executed by Oxford and East/West on November 17, 2008 and November 20, 2008, respectively. Compl. ¶ 41; Malafi Decl. Ex. C.

Notwithstanding the plain language of the 2008 Agreement, Oxford now contends that the agreement failed to accurately specify which of the commission rates was to be paid to Oxford for what type of seat. Compl. ¶ 47. Specifically, Oxford argues that the 2008 Agreement was only created to memorialize Oxford willingness to take a lower commission, that being, $50.00 per seat for the sale of CH-53K Troop Seats. *Id.* ¶ 42. In support of this contention, Oxford points to East/West's termination letter that appears to indicate that the parties were negotiating an amended commission rate for the CH-53K Troop Seats program only. *See* Malafi Decl. Ex. C. Oxford also notes that the 2008 Agreement, as written, makes no sense because helicopter seats were the only product to be provided by East/West to SAC. Id. ¶¶ 44-45.

5

Accordingly, Oxford states that the paragraph referring to the 5% commission had to refer to the CRH Stowable Recovery Team Seat and the Primary Aircrew Cabin Seat as no other products were to be sold. Id. ¶ 44. In sum, Oxford contends that "unbeknownst to [it], [East/West] had mistakenly substituted the term "Helicopter" for the term "Troop" so that the 2008 Agreement reads as though Oxford was to receive a reduced commission for all helicopter seats exclusive of no cost seats rather than a reduce commission for just the CH-53K "Troop" Seats. Id. ¶ 43.

4. **Discovery of the Alleged Mistake**

On or about April 27, 2012, East/West received its first purchase order for CH-53K Troop Seats values at $148,500. Id. ¶ 53. Between October 25, 2013 and March 13, 2015, SAC sent East/West four additional purchase orders for CH-53K Troop Seats. Id. ¶ 55-62. The total purchase price of the orders was $35,415, $45,000, $135,477, and $600,000, respectively. Id. Then, on June 3, 2015, East/West received a contract from SAC for the purchase of up to 178 CRH Stowable Recovery Team Seats between June 2015 and December 2030 with a target value price of $6,740,258. Id. ¶ 63. The contract for the CRH Stowable Recovery Team Seats stated: "[t]his is a ceiling price contract in the amount of $6,740,258.00, there is no financial obligation on the part of [SAC] until a '45 type purchase order release' against this contract" is issued. Id. ¶ 64. However, five days later, SAC did send East/West a "45 type purchase order" for 5 CRH Stowable Recovery Team Seats valued at $1,625,000.00. Id. ¶¶ 66-7.

On or about September 3, 2015, SAC entered into a second contract with East/West to purchase 246 CRH Primary Aircrew Cabin Seats between September 2015 and December 2030 for a target value price of $17,481,600. Id. ¶ 69. As with the contract for the CRH Stowable Recovery Team Seats, the CRH Primary Aircrew Cabin Seats contract provided: "This is a ceiling price contract in the amount of $17,481,600.00, however, there is no financial obligation

6

on the part of [SAC] until the supplier receives a '45 type purchase order. . . ." *Id.* ¶ 70. The following day, SAC sent East/West a "45 type purchase order" for 10 CRH Primary Aircrew Cabin Seats for a total of $2,806,000. *Id.* ¶¶ 72-3.

According to Oxford, sometime between September 3, 2015 and October 2, 2015, when East/West was finally required to pay Oxford a commission, East/West claimed for the first time that the commission due Oxford from the sale of the CRH Stowable Recovery Team Seats and the CRH Primary Aircrew Cabin Seats was limited to $50.00 per seat. *Id.* ¶¶ 76-7. Then, on October 2, 2015, East/West purportedly terminated the 2008 Agreement, effective October 31, 2015. *Id.* ¶ 78. Oxford contends that by the time East/West had terminated the 2008 Agreement, East/West had received several purchase orders for helicopter seats. Specifically, East/West received purchase orders dated the April 27, 2012, October 25, 2013 (revision 2 and 3), January 20, 2014 and March 13, 2015. *Id.* ¶¶ 78, 81, 83, 85, 87. Oxford further contends that each of the orders constituted a fully funded purchase order and/or contract. *Id.* ¶¶ 80, 82, 84, 86.

Oxford also asserts that the June 3, 2015 contract and subsequent June 8, 2015 purchase order for CRH Stowable Recovery Team Seats were received by East/West prior to the effective date of East/West's purported termination of the 2008 Agreement. *Id.* ¶¶ 89-93. Finally, Oxford contends that the September 3, 2015 contract and subsequent purchase order for CRH Primary Aircrew Cabin Seats were also received by East/West prior to the effective date of East/West's purported termination of the 2008 Agreement. *Id.* ¶¶ 94-98.

5. **Oxford's Demand for Payment of Commissions**

For these reasons, following the purported termination of the 2008 Agreement, Oxford demanded to be paid all commissions due on the sales of CH-53K Troop Seats at the rate of fifty

7

dollars ($50.00) per seat, as they come due. *Id.* ¶ 99. Oxford also demanded to be paid commissions on the sales of CRH Stowable Recovery Team Seats pursuant to Contract Number 4801000645 and on the sales of CRH Primary Aircrew Cabin Seats pursuant to Contract Number 4801000668, at the rate of five percent (5%). *Id.* ¶¶ 100-01. Oxford contends that pursuant to the terms of the 2008 Agreement, East/West was required to pay Oxford commissions related to the SAC sales on the last business day of each month following any month East/West received payments from SAC or upon termination of the 2008 Agreement. *Id.* ¶¶ 51-2. According to Oxford, East/West has refused to pay it commissions on the sales of the CRH Stowable Recovery Team Seats or CRH Primary Aircrew Cabin Seats. *Id.* ¶¶ 102-03. In addition, Oxford contends that East/West has advised that it does not intend to pay Oxford commissions as they come due for the sale of either of those seats. *Id.* ¶¶ 104-06.

## DISCUSSION

### I. Standards of Review

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss pursuant to Rule 12(b)(6). District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)). For the purposes of a Rule 12(b) motion, "a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated by reference, and to matters of which judicial notice may be taken." *Serdarevic v. Centex Homes, LLC,* 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010) (quotation omitted); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

Moreover, "[w]hen pleading a claim for fraud or misrepresentation, the plaintiff must aver the alleged fraudulent acts with particularity as required by Fed. R. Civ. P. 9(b). *Arizona Premium Fin., Inc. v. Bielli*, 77 F. Supp. 2d 341, 345 (E.D.N.Y. 1999) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)). To satisfy this pleading requirement, a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). "Knowledge" and "condition of mind" may be stated in general terms. *Arizona Premium Fin., Inc.*, 77 F. Supp. 2d at 345. However, "whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199 (MKB), 2016 WL 5372794, at *14 (E.D.N.Y. Sept. 26, 2016) (citing *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013)).

9

## II.     Statute of Limitations

As a threshold matter, East/West argues that that Oxford's fourth cause of action seeking reformation of the contract based on mutual mistake, fifth cause of action seeking reformation based on fraud, sixth cause of action based on the defendant's alleged fraudulent inducement, eighth cause of action sounding in constructive fraud and ninth cause of action for negligent misrepresentation are all time barred. In diversity cases, federal courts apply the forum state's statute of limitations. *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York . . . statutes of limitations."). With this rule in mind, the Court will begin its analysis by addressing the timeliness of the plaintiff's reformation claim based on mutual mistake.

Although New York law presumes that a signed written agreement reflects the true intention of the parties, "[i]n the proper circumstances, mutual mistake . . . may furnish the basis for reforming a written agreement." *Princeton Restoration Corp. v. Int'l Fid. Ins. Co.*, 338 F. Supp. 2d 391, 394–95 (E.D.N.Y. 2004) (citing *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986)). "A case of 'mutual mistake' arises when 'the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement.'" *Id.* New York courts apply a six-year statute of limitations to reformation claims based on mutual mistake. *See* CPLR 213(6). The statute of limitations begins to run at the time the alleged mistake occurred. *Bielawa v. Bielawa*, 62 Misc. 3d 1218(A) (N.Y. Sup. Ct. 2018) (citing *Matter of Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 547 (1995); *Stidolph v. 771620 Equities Corp.*, 103 A.D.3d 705, 706, 959 N.Y.S.2d 718 (2d Dep't 2013) (cause of action for reformation of a contract on the ground of mistake is subject to a six-year statute of limitations,

10

accruing from the date the alleged mistake was made)). In this case, the 2008 Agreement was executed by Oxford and East/West on November 17, 2008 and November 20, 2008, respectively. Compl. ¶ 41; Malafi Decl. Ex. D. 43. Although Oxford contends that the version of the 2008 Agreement failed to adequately memorialize the parties' agreement to lower the commission that it was to receive from East/West regarding the CH-53K Troop Seat *only*, Oxford's time to bring a claim for reformation of contract based on that mutual mistake expired in November 2014.[3] Thus, the undersigned recommends that the plaintiff's fourth cause of action for reformation based on mutual mistake be dismissed.

Similarly, under New York law, a cause of action based on fraud must be commenced within six years of the commission of the fraud, or two years from the date the fraud could reasonably have been discovered, whichever is longer. *Von Blomberg v. Garis*, 44 A.D.3d 1033, 1034, 845 N.Y.S.2d 80 (2d Dep't 2007) (citing CPLR 213 (8)); *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 396 (E.D.N.Y. 2018) ("If the claim is based on fraud, then CPLR § 213(8) also applies a six-year period in addition to a two-year discovery rule."). A claim for reformation predicated upon fraud is governed by the same statute of limitations. *Von Blomberg*, 44 A.D.3d at 1034. "The burden of establishing that the fraud could not have been discovered prior to the two-year period before the commencement of the action rests on the plaintiff who seeks the benefit of the exception." *Id.* (citing *Siler v Lutheran Social Servs. of Metro. N.Y.*, 10 A.D.3d 646, 648 (2d Dep't 2004).

In this case, the facts set forth in the complaint reveal that by September 3, 2015, East/West had already claimed that the commission due to Oxford from the sale of the CRH

---

[3]Although East/West has accepted the plaintiff's allegations as true for the purposes of this motion, it warrants mention that East/West vehemently argues that the provisions of the 2008 Agreement that altered Oxford's commission structure were "fiercely negotiated" and correctly reflect the parties' agreement. Def.'s Mem. at 4.

Stowable Recovery Team Seats and the CRH Primary Aircrew Cabin Seats was limited to $50.00 per seat. Compl. ¶¶ 76-7. The complaint was not filed until April 3, 2018. ECF No. 1. Accordingly, even if the Court applies the longer limitations, that being, two years from the date the alleged fraud could have reasonably been discovered rather than six years after the alleged commission of the fraud, the plaintiff's fraud claims and claims for reformation based on fraud are also time-barred. Therefore, the undersigned recommends that fifth, sixth, eighth and ninth causes of action be dismissed.

### III.  Failure to Plead with Specificity

Moreover, it warrants mention that, even if the fraud claims were not time-barred, Oxford failed to state the circumstances constituting the fraud with particularity. "'To state a claim for fraud under New York State law, a plaintiff must allege "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 398 (E.D.N.Y. 2018) (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)). In addition, as previously stated, pursuant to Rule 9(b), an affirmative misrepresentation claim must also "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (citing *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)).[4]

---

[4] "'Constructive fraud requires establishing [the] same elements [as fraud], except that scienter is replaced by a fiduciary or confidential relationship between the parties.'" *Spinnato*, 322 F. Supp. 3d at 403–04 (citing *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp.2d 387, 396 (S.D.N.Y. 2010)). However, in New York a "'conventional business relationship, without more, does not become a fiduciary relationship by mere allegation.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 194 (S.D.N.Y. 2011) (citing *Friedman v. Anderson*, 23 A.D.3d 163, 803 N.Y.S.2d 514, 516 (2005)). Thus, where, as here, parties are dealing at arms-length in a commercial transaction, the parties lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation. *Id.*

12

In this case, Oxford repeatedly states that as a result of a mistake, not fraud, the parties failed to properly reflect the fact that Oxford was to continue to receive a 5% commission for all products sold by East/West to SAC except for the CH-53K Troop Seat. *See e.g.* Compl. ¶49. Nonetheless, Oxford simultaneously pleads that the error was the result of some sort of fraudulent conduct on the part of East/West. Moreover, while Oxford has annexed the email of Joe Spinosa, Vice President of Business Development for Est/West, forwarding a proposed 2008 Agreement as well as the termination letter and the 2008 Agreement, Oxford does little to explain the nature of the misrepresentation other than to state that the "Defendant, its officers, representative, agents and/or employees made omissions of material fact." Indeed, Oxford has not identified a single statement that was "misrepresented" or "omitted" from the parties' discussions. Nor does Oxford attempt to explain why the statements were fraudulent. Instead, Oxford repeatedly notes that the terms in the agreement were simply incorrect. Accordingly, Oxford has also failed to meet the heightened pleading requirements with respect to its fraud claims.

## IV. The Plaintiff's Request for a Declaratory Judgment and Claims for Breach of Contract and Anticipatory Breach of Contract

Given the undersigned's determination that the claims for reformation of contract should be dismissed, the Court must also recommend that Oxford's claim for breach of contract, anticipatory breach of contract and its request for a declaratory judgment be dismissed. These three causes of action are premised on the terms that Oxford claims should have appeared in the contract rather than on the actual terms of the 2008 Agreement. For example, Oxford claims that it is entitled to a declaration that East/West is obligated, "pursuant to the terms of the 2008 Agreement," to pay Oxford commissions for the following:

> a. Defendant's sales of CH-53K Troop Seats to SAC, at the rate of fifty dollars ($50.00) per seat, as they come due, . . ..
>
> b. Defendant's sales of CRH Stowable Recovery Team Seats to SAC pursuant to Contract Number 4801000645, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due, . . ..
>
> c. Defendant's sales of CRH Primary Aircrew Cabin Seats to SAC pursuant to Contract Number 4801000668, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due, . . ..

Compl. ¶134. In a similar vein, Oxford's breach of contract and anticipatory breach of contract claims are premised on East/West's alleged failure to pay Oxford $50.00 for each of the CH-53K Troop Seat sold by East/West and 5% on the total sale of CRH Stowable Recovery Team and CRH Aircrew Cabin Seats to SAC. *Id.* ¶¶ 136-77. However, the terms of the 2008 Agreement, as stated, do not provide for such payments. Rather, the terms reflect the following:

> Terms of OXFORD's fees shall be:
>
> 1)   Retainer
>
> EAST/WEST agrees to retain OXFORD at a rate of two thousand dollars ($2,000.00) per month commencing the month following execution of this agreement. Retainer payments made will be offset against commissions earned.
>
> 2)   <u>Commission schedule specific to Helicopter Seat Programs</u>
>
> For all helicopter seats sold to Customer, excluding seats provided at no cost, OXFORD's commission will be fifty dollars ($50.00) per seat.
>
> 3)   <u>Standard Commission schedule</u>
>
> EAST/WEST shall pay OXFORD commission for all other sales at, a rate of 5% based upon payments received by EAST/WEST from Customer for any product or service provided by EAST/WEST to Customer.

Malafi Decl. Ex. C. Accordingly, Oxford cannot sustain these claims if the 2008 Agreement is not reformed.

14

Moreover, to the extent that Oxford is claiming that East/West breached the terms of the 2008 Agreement by terminating the contract after a disagreement arose as to the commissions owed to Oxford, the undersigned finds that the terms of the 2008 Agreement permitted either party to terminate the agreement on 30 days advance written notice. *Id.* For these reasons, the undersigned respectfully recommends that the first, second and third cause of action also be dismissed.

### V. Labor Law Claims

With respect to the thirteenth cause of action, East/West argues that Oxford's claim pursuant to New York Labor Law ("NYLL") § 191-c cannot stand because Oxford is not a sales representative as defined in the section. NYLL "§ 191–b protects 'sales representatives' in their dealings with their principals and sets out the requirements for payment of commissions." *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 369 (S.D.N.Y. 2006). "Section 191–c provides for double damages, in addition to fees and costs, in the event of a violation of § 191–b." Specifically, § 191–c provides:

> 1. When a contract between a principal and a sales representative is terminated, all earned commissions shall be paid within five business days after termination or within five business days after they become due in the case of earned commissions not due when the contract is terminated.
>
> \* \* \*
>
> 3. A principal who fails to comply with the provisions of this section concerning timely payment of all earned commissions shall be liable to the sales representative in a civil action for double damages. The prevailing party in any such action shall be entitled to an award of reasonable attorney's fees, court costs, and disbursements.

N.Y. Lab. Law § 191-c (McKinney). The term "sales representative" is defined in § 191-a as "a person or entity who solicits orders in New York state and is not covered by [§ 190(6) and 191(1)(c) which protect employees who earn commissions as part of their salary] because he or

15

she is an independent contractor." *Derven,* 427 F. Supp. 2d at 369 (citing N.Y. Lab. Law § 191-a (McKinney).

According to the complaint, Oxford acted as a sales representative for companies seeking to procure the opportunity to contract with SAC to manufacture and sell helicopter seats to SAC. Compl. ¶ 16. However, the fact that it represented East/West in connection with the sale of helicopter seats to SAC does not mean that it acted as a sales representative within the meaning of the statute. Indeed, Oxford has failed to allege any facts demonstrating that it "solicited" orders for East/West in New York. Instead, Oxford argues that East/West's sales and communications all originated from their offices in New York. However, there is a difference between the solicitation of a sale and the sale itself and the focus here must be on Oxford's solicitation of the sales from SAC. *See McCoy Assocs., Inc. v. Nulux, Inc.,* 218 F. Supp. 2d 286, 293 (E.D.N.Y. 2002) ("[T]he fact that McCoy Associates sold products to New York customers does not mean that it solicited business here Obviously, there is a difference between the solicitation of a sale and the sale itself; it is certainly possible to sell something without soliciting its sale."). Given that Oxford and SAC are both Connecticut corporations, *see id.* ¶8, it stands to reason that the solicitations all took place in Connecticut. Def.'s Mem. at 15. Accordingly, there is nothing in the record to suggest that Oxford solicited orders in New York, and therefore, the undersigned recommends that the thirteenth cause of action also be dismissed.

V. **General Business Law**

For a similar reason, the undersigned respectfully recommends that the seventh cause of action alleging a violation of section 349 of the New York General Business Law ("NYGBL") be dismissed. "To state a claim under [NYGBL] § 349, a plaintiff must allege '(1) acts or practices that are 'consumer-oriented'; (2) that such acts or practices are deceptive or misleading

16

in a material way; and (3) that plaintiff has been injured by reason of those acts.'" *DePasquale v. Allstate Insurance Co.*, 179 F. Supp. 2d 51, 58 (E.D.N.Y.) (citing *Gaidon v. Guardian Life Insurance Co. of America*, 94 N.Y.2d 330, 343–44 (1999)). Private contract disputes unique to the parties do not fall within the ambit of the statute. *Lava Trading Inc. v. Hartford Fire Ins. Co.*, 326 F. Supp. 2d 434, 438 (S.D.N.Y. 2004). Here, Oxford's allegations are focused entirely on the private dispute that occurred between itself and East/West concerning the terms of the 2008 Agreement. *See MaGee v. Paul Revere Life Insurance Co.*, 954 F. Supp. 582, 586 (E.D.N.Y.1997) (allegations that insurer refused to pay benefits inadequate to state a claim under Section 349 since any other conclusion would effectively permit a plaintiff to convert almost any garden variety breach of contract cause of action into a violation of section 349). Indeed, nothing in the complaint suggests that the transactions at issue affected the consuming public at large. As such, the claim must be dismissed.

### VI. Unjust Enrichment and Implied Covenant of Good Faith and Fair Dealing

Oxford has also asserted three quasi-contractual claims -- unjust enrichment prior to October 31, 2015 (tenth cause of action), unjust enrichment prior and subsequent to October 31, 2015 (eleventh cause of action), and breach of the implied covenant of good faith and fair dealing (twelfth cause of action). "In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (internal quotation marks and citations omitted); *Old Republic Nat'l Title Ins. Co. v. Luft,* 52 A.D.3d 491, 491-92, 859 N.Y.S.2d 261 (N.Y. App. Div. 2008). However, the existence of an enforceable written contract governing a particular subject matter ordinarily

17

precludes recovery in quasi contract for events arising out of the same subject matter. *Good Luck Prod. Co. v. Crystal Cove Seafood Corp.*, 60 F. Supp. 3d 365, 375 (E.D.N.Y. 2014). In this case, there is no dispute as to the validity of the 2008 Agreement notwithstanding the fact that Oxford seeks to alter the terms. Nor is this a case where Oxford has plead alternative relief should the Court ultimately determine that the 2008 Agreement is invalid. Rather, the unjust enrichment claim is directly duplicative of the breach of contract claim. Specifically, Oxford asserts in its first unjust enrichment claim that East/West has been unjustly enriched by virtue of the proceeds it received from SAC without paying Oxford commission on the following:

> a. Defendant's sales of CH-53K Troop Seats to SAC, at the rate of fifty dollars ($50.00) per seat, as they come due, including, but not limited to:
>
>> (i) Defendant's sales of CH-53K Troop Seats to SAC pursuant to Purchase Order Number 5500031506 revision 3, at the rate of fifty dollars ($50.00) per seat, as they come due;
>>
>> (ii) Defendant's sales of CH-53K Troop Seats to SAC pursuant to Purchase Order Number 5500117461, at the rate of fifty dollars ($50.00) per seat, as they come due;
>
> b. Defendant's sales of CRH Stowable Recovery Team Seats to SAC pursuant to Contract Number 4801000645, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due, including, but not limited to:
>> (i) Defendant's sales of CRH Stowable Recovery Team Seats to SAC pursuant to Purchase Order Number 4500392870, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due; and,
>
> c. Defendant's sales of CRH Primary Aircrew Cabin Seats to SAC pursuant to Contract Number 4801000668, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due, including, but not limited to:
>
>> (i) Defendant's sales of CRH Primary Aircrew Cabin Seats to SAC pursuant to Purchase Order Number 4500404963, at the rate of five percent (5%) of all payments received by Defendant from SAC, as they come due. . ..

Compl. ¶ 309.

In a similar vein, the eleventh cause of action alleges that East/West will be unjustly enriched if it is permitted to retain the proceeds of the sales of helicopter seats to SAC for the JMR Project, the S-97 Raider Project, the CH-53D/E Program, the CH-53K Crash-Attenuating Program, the MH-53E Program, the CH-47D/F Crashworthy Crew Chief Program, the CH-47D/F Crash-Resistant Troop Program, the Mobility Box Troop Seat System Program, and the Cargo Ramp Gunner Seat Program unless it is required to pay Oxford a 5% commission on all of those sales. However, the 2008 Agreement governed the commission to be paid to Oxford on "all helicopter seats sold excluding seats provided at no cost." Accordingly, to the extent Oxford claims entitlement to a commission on the contract entered into by East/West after the 2008 Agreement was terminated by virtue of the vendor code that it obtained for East/West, Oxford's entitlement to such commissions was also governed by a valid agreement.

Finally, Oxford's claim for breach of the implied covenant of good faith and fair dealing should also be dismissed as duplicative of its breach of contract claim. "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013). "Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Id.* Accordingly, it is respectfully recommended that Oxford's claim for breach of the implied covenant of good faith and fair dealing be dismissed.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court on the parties. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Such objections shall be filed with the Clerk of the Court via ECF. Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal of the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchant's Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
July 24, 2019

_____/s_____
ARLENE R. LINDSAY
United States Magistrate Judge